In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2828

LESTER DOBBEY,

*Plaintiff-Appellant*,

*v.*

ILLINOIS DEPARTMENT OF CORRECTIONS, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:07-cv-00818-GPM—**G. Patrick Murphy**, *Judge*.

ARGUED JUNE 9, 2009—DECIDED JULY 28, 2009

Before BAUER, POSNER, and TINDER, *Circuit Judges*.

POSNER, *Circuit Judge*. The district judge dismissed this prisoner's civil rights suit (42 U.S.C. § 1983), which names the Illinois Department of Corrections, along with prison personnel, as defendants. He dismissed the suit before service of process, on the authority of 28 U.S.C. § 1915A, which so far as bears on this case directs dismissal then if the complaint fails to state a claim or if it

seeks monetary relief from an immune defendant. §§ 1915A(b)(1), (2). The Illinois Department of Corrections was properly dismissed on the authority of *Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989). Whether the complaint fails to state a claim against the individual defendants, as the judge also believed, is a more difficult question.

The complaint alleges the following facts, which in the procedural posture of the case we are required to assume are true. The plaintiff was an inmate of Menard, an Illinois state prison. He worked as a janitor, and had given the prison no trouble in the five years he had been there. One morning before dawn, he and three other inmates—two of them black, like himself—were preparing breakfast trays when they noticed five guards, all white, playing cards in the main control room (the "officers' cage," as it is known), the interior of which was visible to them. One of them got up from the card table and hung a noose from the ceiling of the room. He swatted at the noose to make it swing back and forth, then sat down in a chair and "crossed his arms looking crazy with evil eyes." Two other inmates, of whom at least one was black (the complaint does not mention the race of the other), chanced on the scene and saw the noose. The noose was taken down by another guard 20 minutes after it had been put up.

The plaintiff filed a grievance complaining of the guard's conduct. Two days later he was interviewed by an internal affairs officer who said to him: "What did [the officer who had hung the noose] tell you, he was going

to hang you or something?. . . . Well, he won't have to worry about hanging nobody, because he just hung himself."

The next day the plaintiff sent letters describing the noose incident to news outlets, as well as to various state officials. A month later, however, a prison disciplinary charge was filed against him for allegedly disobeying a guard's order that the plaintiff scrape wax off a section of floor in the prison. According to the plaintiff, he was scraping diligently but the guard told him "you're on Bullshit around here!" A disciplinary committee upheld the charge and imposed various sanctions on the plaintiff, including the loss of his prison job. Later the plaintiff was told that his grievance arising out of the incident involving the noose had been denied because "there was no evidence of the noose." He then filed this suit.

He claims that the incident constituted cruel and unusual punishment in violation of his federal constitutional rights. We think the district judge was right to dismiss that claim. We are mindful of the ugly resonance of the noose, symbolic of the lynching of blacks, for black people. And a threat, which is how the plaintiff interpreted the incident, can rise to the level of cruel and unusual punishment. *Irving v. Dormire*, 519 F.3d 441, 445, 449-50 (8th Cir. 2008); *Northington v. Jackson*, 973 F.2d 1518, 1524 (10th Cir. 1992). "Mental torture is not an oxymoron, and has been held or assumed in a number of prisoner cases to be actionable as cruel and unusual punishment," *Thomas v. Farley*, 31 F.3d 557, 559 (7th Cir. 1994) (citations omitted)—imagine falsely informing a prisoner that he

has been sentenced to death. But getting up in the middle of a card game to hang a noose in the sight of black prisoners, while the other players calmly continue the game, cannot reasonably be taken seriously as a threat, rather than as racial harassment (as in *Tademy v. Union Pacific Corp.*, 520 F.3d 1149, 1159 (10th Cir. 2008)). There was a prompt investigation, and, though we don't know what happened to the guard who hung the noose, there is no suggestion of any further trouble from him.

The plaintiff says that he was afraid that the guard would "snap" and "go postal," but the circumstances did not justify such a fear. The test for what constitutes "cruel and unusual punishment" is an objective one. It is not the actual fear of the victim, but what a "reasonable" victim would fear. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Hudson v. McMillian*, 503 U.S. 1, 8 (1992); *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006). (Realistically, this means the average victim. "A certain amount of negligence is unavoidable, because the standard of care is set with reference to the average person and some people have below-average ability to take care and so can't comply with the standard, and because in any event efforts at being careful produce only a probability, not a certainty, of avoiding careless conduct through momentary inattention." *Davis v. Consolidated Rail Corp.*, 788 F.2d 1260, 1266 (7th Cir. 1986); see also *Moran v. Clarke*, 296 F.3d 638, 648-49 (8th Cir. 2002); cf. *Restatement (Second) of Torts*, § 46, comment d; § 289, comment i (1965).)

Any harassment of a prisoner increases his punishment in a practical sense, if we equate punishment to the

infliction of disutility (and why not?). But harassment, while regrettable, is not what comes to mind when one thinks of "cruel and unusual" punishment. Nor does it inflict injury comparable in gravity to failing to provide a prisoner with adequate medical care or with reasonable protection against the violence of other prisoners. The line between "mere" harassment and "cruel and unusual punishment" is fuzzy, but we think the incident with the noose and the "evil eyes" falls on the harassment side of the line because it was not a credible threat to kill, or to inflict any other physical injury. The case falls well short of *Burton v. Livingston*, 791 F.2d 97, 100-01 (8th Cir. 1986), where a prisoner alleged that a guard pointed a gun at him, cocked it, called him "nigger," and repeatedly threatened to shoot him, or *Irving v. Dormire*, *supra*, 519 F.3d at 449-50, where a prisoner alleged that a guard had threatened to kill him, repeatedly offered a bounty to any prisoner who would assault him, and gave a prisoner a razor blade with which to assault him. See also *Northington v. Jackson*, *supra*, 973 F.2d at 1524.

The plaintiff further claims that the defendants retaliated against him for his exercising his First Amendment rights—in other words, they punished him for his speech—and if this is correct they violated the amendment and by doing so gave him a valid basis for suing them under 42 U.S.C. § 1983. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009); *Powers v. Snyder*, 484 F.3d 929, 933 (7th Cir. 2007); *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003). On this record, we must assume that the plaintiff's punishment for allegedly failing to scrape wax as

ordered was indeed retaliation for filing a grievance about, and for publicizing, the noose incident, so that the issue to be resolved is whether the filing or the publicizing was protected by the First Amendment. There is considerable authority—however one might be inclined to question it as an original matter, see *Woodruff v. Mason*, 542 F.3d 545, 559, 561 (7th Cir. 2008) (concurring opinion)—that the filing of *any* lawsuit is protected by the First Amendment as a form of petitioning government for the redress of grievances. And if so it might seem to follow that the required exhaustion of administrative remedies, as by the filing of a grievance with prison authorities—a prerequisite to bringing suit under section 1983, 42 U.S.C. § 1997e(a); *Jones v. Bock*, 549 U.S. 199, 211 (2007); *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002)—would also be protected, as the first stage in petitioning for redress of grievances—or indeed as itself a petition for such redress, as held in *Foraker v. Chaffinch*, 501 F.3d 231, 237 (3d Cir. 2007); see also *Powers v. Snyder, supra*, 484 F.3d at 933; *Hasan v. U.S. Dep't of Labor*, 400 F.3d 1001, 1005 (7th Cir. 2005); *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 584 (D.C. Cir. 2002); *Franco v. Kelly*, 854 F.2d 584, 589-90 (2d Cir. 1988).

But it is not clear that the right conferred by the First Amendment to "petition the Government for the redress of grievances" should be thought to embrace *every* nonfrivolous complaint that a prisoner might make. Remarkably, the right is little discussed either in cases or in commentaries, Carol Rice Andrews, "A Right of Access to Court under the Petition Clause of the First Amend-

ment: Defining the Right," 60 *Ohio State L.J.* 557 n. 3 (1999), and its scope is unsettled. We defined it rather narrowly in *Altman v. Hurst*, 734 F.2d 1240, 1244 n. 10 (7th Cir. 1984) (per curiam), stating that "a private office dispute cannot be constitutionalized merely by filing a legal action." See also *Yatvin v. Madison Metropolitan School District*, 840 F.2d 412, 419-20 (7th Cir. 1988). The Tenth Circuit, however, has defined the right exceedingly broadly, saying that "a private citizen exercises a constitutionally protected First Amendment right *anytime* he or she petitions the government for redress; the petitioning clause of the First Amendment does not pick and choose its causes. The minor and questionable, along with the mighty and consequential, are all embraced." *Van Deelen v. Johnson*, 497 F.3d 1151, 1156 (10th Cir. 2007) (emphasis in original); see also *Foraker v. Chaffinch*, *supra*, 501 F.3d at 234-38. The Supreme Court has said that the grievances to which the clause applies "are not solely religious or political ones." *United Mine Workers v. Illinois State Bar Association*, 389 U.S. 217, 357(1967); see also *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972); *Stern v. United States Gypsum, Inc.*, 547 F.2d 1329, 1343 (7th Cir. 1977). But that leaves a lot to argue over.

This is not the case in which to try to straighten out the law of petitioning for redress of grievances. For even if the right does not embrace purely personal grievances, still we do not agree with the district judge that the plaintiff's grievance was merely a "personal gripe," as if he had been complaining that the prison commissary had shortchanged him for some item that he had bought. And even if it were merely that, retaliation for *uttering* it

would be, prima facie (that is, without regard for whatever right the prison might have to suppress it), an infringement of freedom of speech, *Bridges v. Gilbert*, *supra*, 557 F.3d at 547-51, whatever the status of the "personal gripe" might be as a petition for redress of grievances.

In summary: The dismissal of the Illinois Department of Corrections as a defendant, and the dismissal of the plaintiff's claim to having been subjected to a cruel and unusual punishment, are affirmed. (A third claim, that the disciplinary sanctions deprived him of liberty or property without due process of law, is barred by cases like *Thomas v. Ramos*, 130 F.3d 754, 762 n. 8 (7th Cir. 1997), interpreting *Sandin v. Conner*, 515 U.S. 472 (1995).) But the dismissal of his claim that his right of free speech was infringed is reversed and the case remanded accordingly. We offer no opinion on the ultimate merits of that claim because further development of the record may cast the facts in a different light from the complaint.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.