NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted August 15, 2018[*]
Decided August 16, 2018

**Before**

MICHAEL S. KANNE, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

Nos. 17-2430, 17-3603, & 17-3640

| | |
|---|---|
| LESTER DOBBEY,<br> *Plaintiff-Appellant*, | Appeals from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 1:12-cv-09223 |
| IMHOTEP CARTER,<br> *Defendant-Appellee*. | Robert M. Dow, Jr.,<br>*Judge*. |

**O R D E R**

Illinois inmate Lester Dobbey sued prison doctor Imhotep Carter for deliberate indifference toward his knee pain, contending that the doctor needlessly delayed his receipt of a knee sleeve and failed to follow up with him after administering a steroid injection. The district court entered summary judgment for the doctor, concluding that

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

he was not responsible for the delays in treatment that Dobbey experienced. We agree and affirm the judgment.

Dobbey first saw Dr. Carter for pain in his knees on October 7, 2011. Dr. Carter diagnosed tendonitis and recommended two treatments: a knee sleeve, and an injection of a steroid into Dobbey's left knee.

Dr. Carter administered the steroid injection on October 27. He noted that he planned to follow up with Dobbey in three weeks to consider whether Dobbey should receive an injection in his right knee. But the nursing staff, which was responsible for scheduling appointments, did not schedule this follow-up. An appointment eventually was made for Dobbey to see Dr. Carter on January 24, 2012, but that appointment had to be cancelled because the prison was on lockdown. Not until March 20 did Dobbey finally see Dr. Carter, who then diagnosed mild degenerative-joint disease and tendonitis, and prescribed Naproxen.

Dobbey also experienced a long delay waiting for the knee sleeve. At the October 7 appointment, Dr. Carter had filled out a "medical permit" authorizing the sleeve, and the permit was approved two weeks later by Wexford Health Sources, the medical provider for Stateville Correctional Center in Illinois. Months went by, and in February 2012 Dr. Carter signed a "prescription order" for a knee sleeve (how this order differed from the medical permit he filled out four months earlier is not explained in the record). But Dobbey still did not receive a knee sleeve, and he filed grievances about the delay in his treatment. On March 20, when he again saw Dr. Carter, the doctor filled out a new medical permit authorizing a knee sleeve, which Dobbey soon received.

Dobbey filed suit under 42 U.S.C. § 1983, asserting that Dr. Carter was deliberately indifferent to his knee pain by failing to ensure he received the knee sleeve in a timely manner and by failing to follow up with him after the steroid injection.[1] The district judge entered summary judgment for Dr. Carter. The judge concluded that Dr. Carter could not have been deliberately indifferent to Dobbey's needs, as there was

---

[1] Dobbey also sued a nursing supervisor who reviewed several grievances he filed about the treatment of his knee pain. The district court determined that fact questions existed over the degree of her personal involvement in Dobbey's medical care, and declined to enter summary judgment in her favor. She later settled with Dobbey.

no evidence that he had any control over the delays Dobbey experienced in receiving a knee sleeve or scheduling a follow-up appointment after his steroid injection.

On appeal, Dobbey first contends that a material dispute exists over whether Dr. Carter timely filed the necessary paperwork to allow him to receive a knee sleeve. If he did not, he may be liable for causing a delay in Dobbey's treatment that "exacerbated the injury or unnecessarily prolonged [his] pain." *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011). But the record shows that Dr. Carter followed all the steps required to assist Dobbey to obtain the knee sleeve. Prison policy allows an inmate to receive medical equipment once (1) a physician orders it, (2) the medical director approves the order, and (3) in some cases, a "collegial review" approves it as well. At Dobbey's first appointment on October 7, Dr. Carter wrote that Dobbey should wear a knee sleeve and filled out a medical permit authorizing one. He did not learn that Dobbey had not received a knee sleeve until their next visit, on March 20, at which time he filled out another medical permit to help Dobbey receive one. Prison policy provides that other employees are responsible for actually securing and issuing medical equipment to inmates, so Dr. Carter could have done no more without usurping another employee's job duties (which is not required, *see Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009)).

Dobbey seems to argue, however, that the record also raises a question about whether Dr. Carter was obligated to fill out another document, besides a medical permit, for him to receive a knee sleeve. He appears to rely on a statement Dr. Carter made during discovery: that an inmate cannot receive a knee sleeve until a physician "prescribes" one, and then fills out a medical permit authorizing it. Dobbey understands this statement to mean that the "prescription order" Dr. Carter signed in February 2012 was a necessary prerequisite to a medical permit. Because Dr. Carter signed this document four months *after* filling out the medical permit, Dobbey contends that the doctor deliberately ignored and prolonged his knee pain.

But Dr. Carter's statement that a physician must "prescribe" a knee sleeve does not necessarily mean that a doctor must fill out a "prescription order" form of the sort that Dobbey identifies. As Dr. Carter explained, he "prescribed" a knee sleeve for Dobbey on October 7, when he noted Dobbey's need for the sleeve and filled out a medical permit. Prison policy does not contradict Dr. Carter's understanding of what it means to "prescribe" medical equipment, and there is no evidence—beyond Dobbey's speculation—that the "prescription order" form is a required component of the policy.

Next, Dobbey contends that a dispute of fact exists about Dr. Carter's obligation to make sure he received a follow-up appointment after the steroid injection. Dobbey

points to Dr. Carter's statement during discovery that he had a "general practice" of following up with inmates after administering steroid injections. In Dobbey's view, Dr. Carter did not follow his own "general practice" because he did not follow up with Dobbey until nearly five months after the steroid injection, despite writing in his notes that he intended to follow up with Dobbey after just three weeks.

But Dobbey cannot point to any evidence that Dr. Carter was obliged to ensure that he received a follow-up appointment within three weeks. The record shows that Dr. Carter could not be personally responsible for scheduling *any* appointments with inmates because appointments were scheduled by the nursing staff. "[N]o prisoner is entitled to insist that one employee do another's job," *Burks*, 555 F.3d at 595, so Dr. Carter's reliance on the nursing staff to schedule his follow-up appointment with Dobbey was justified. Further, even if Dr. Carter had responsibility for scheduling appointments, his statement about his "general practice" did not describe any time constraints; Dobbey's five-month follow-up may well have been consistent with the doctor's general practice.

Dobbey next argues that the district court erred by declining his request early in the proceedings to recruit a lawyer to assist him with his case. But the court correctly denied the request because Dobbey did not assert that he had made a "reasonable attempt" to secure counsel on his own. *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007) (en banc). Dobbey is a seasoned litigator who has successfully prosecuted at least two appeals in this court, *see, e.g.*, *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938 (7th Cir. 2015); *Dobbey v. Ill. Dep't of Corr.*, 574 F.3d 443 (7th Cir. 2009), so the court's insistence that he follow the requirements of *Pruitt* was not unreasonable.

Finally, Dobbey contends that the district court erred when it denied his request to recruit an orthopedic expert to opine about the severity of his knee problems. But Federal Rule of Evidence 706 allows appointment of an expert witness if necessary to help the *court* understand the issues, not to assist a party in preparing his case. *See Ledford v. Sullivan*, 105 F.3d 354, 358–59 (7th Cir. 1997). The court reasonably concluded that this case—which hinged on Dr. Carter's knowledge and personal involvement rather than a medical issue—was comprehensible to a layperson. *See Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004); *Ledford*, 105 F.3d at 359–60.

We have considered Dobbey's remaining arguments, but none merits further discussion.

                                                                                                AFFIRMED