**George RAKOVICH, Plaintiff-Appellee,**

v.

**Gregory WADE and Darryl Drake, Defendants-Appellants.**

**George RAKOVICH, Plaintiff-Appellee,**

v.

**Chester KASS, Defendant-Appellant.**

Nos. 85–1529, 85–1530.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 18, 1986.

Decided May 22, 1987.

As Amended May 27, 1987.

---

Donald L. Piette, Piette, Knoll & Nelson, S.C., Milwaukee, Wis., for defendants-appellants.

Michael O. Bohren, Marola & Bohren, Milwaukee, Wis., for plaintiff-appellee.

Before COFFEY and RIPPLE, Circuit Judges, and WILL, Senior District Judge.[*]

RIPPLE, Circuit Judge.

The appellee, George Rakovich, brought this action to recover damages for an alleged violation of his first amendment rights. He charged that the appellants, officers of the Greenfield, Wisconsin police department, subjected him to a criminal investigation in retaliation for his earlier opposition to, and criticism of, Greenfield city officials. He alleged that the officers conducted that investigation despite their knowledge that no reasonable grounds existed to suspect him of a criminal act. After a jury trial, Mr. Rakovich was awarded $50,000 for compensatory damages and $90,000 for punitive damages. In addition, the district court awarded him $41,285.25 for attorneys' fees, 602 F.Supp. 1444. This appeal followed.

We affirm the jury's finding of liability. However, we conclude that the jury's compensatory damage award is grossly excessive and its punitive damage award is greater than the amount necessary to deter similar future conduct or to punish the defendants. Accordingly, we remand this case to the district court for a new trial limited to the issue of damages.

## I

This case began with the burglary of Cars Unlimited, a used car dealership located in Greenfield, Wisconsin. On the night of July 2, 1981, Vincent Sheehan, an employee of Cars Unlimited, noticed that two men had broken into a garage on the property. He alerted the police while the burglary was still in progress. Police officers from both Greenfield and Greendale, a neighboring city, were sent to the scene. Upon arriving at the garage, Officers Mary Foley and William Myers captured the burglary suspects.

A short time after the arrests, only Officer Foley, the Greenfield officer, received a commendation for her work. Apparently, the commendation was based on the misapprehension that Officer Foley had single-handedly captured both suspects. As more information became available about the arrests, a controversy arose concerning the propriety of the Foley commendation. Therefore, Chester Kass, Chief of the Greenfield Police Department, assigned Detective Gregory Wade and Sergeant Darryl Drake to investigate this matter. As part of their investigation, Officers Wade and Drake interviewed Mr. Sheehan. At the close of the interview, after describing the arrest, Mr. Sheehan told the investigating officers that two other people had already spoken to him regarding the commendation. He was able to identify one of those persons as Charles Salbashian, another Greenfield police officer. Mr. Sheehan was unclear about the second person's identity, although he was certain that both men intimated that Officer Foley received her commendation because her father was a judge—not because her conduct in capturing the burglary suspects was extraordinarily meritorious. Mr. Sheehan was later able to identify the second man as George

Rakovich.[1] According to Mr. Sheehan, on a number of occasions, Mr. Rakovich returned to Cars Unlimited to speak with him about the arrest. Detective Wade was able to corroborate that statement with photographs he took of Mr. Rakovich at Cars Unlimited on September 12, 1981.

Officers Wade and Drake presented their information to Chief Kass and, subsequently, to Frank T. Crivello, the Assistant District Attorney assigned to prosecute the Cars Unlimited burglary. Mr. Crivello was concerned by the Rakovich and Salbashian discussions with Mr. Sheehan—the chief witness in the burglary case. Accordingly, he suggested that Robert Scopoline, a sergeant of the Milwaukee County Sheriff's Department, interview Mr. Rakovich in an attempt to determine why he was contacting Mr. Sheehan. Sergeant Scopoline did, in fact, interview Mr. Rakovich. At that meeting, he advised Mr. Rakovich of his *Miranda* rights, explained the nature of the investigation, and informed him that the conversation was being recorded.

Before receiving Sergeant Scopoline's report, Mr. Crivello decided to summon Mr. Rakovich and Mr. Salbashian to his office for a charging conference. This decision was based solely on the information presented orally to him by Officers Wade and Drake. Shortly before the charging conference, Chief Kass sent Mr. Crivello a strongly worded letter concerning the Rakovich case. In that letter, Chief Kass concluded that:

> The investigation leaves no question in my mind that the unlawful conduct of these two public officers [Rakovich and Salbashian] has violated the trust and confidence of their positions as public officers. Their intentions and actions were premeditated and deliberate; designed to damage Officer Foley, undermine and damage the department's func-

tioning and the city's reputation, and the [burglary] investigation.

Ex. 24, Appellants' App. at 68. In addition, Chief Kass informed the newspapers on September 21, 1981 that Mr. Rakovich would be called before a charging conference. Mr. Rakovich apparently did not receive notice of the conference until three days later.

The charging conference, conducted on October 16 and open to the public, was an investigative procedure in which the district attorney could attempt to clarify the allegations which had been made. At such a conference, it was not unusual for the investigating officers to suggest statutes which possibly had been violated. This case was no exception; Officers Wade and Drake presented the district attorney with a number of criminal statutes which they believed to be applicable to Mr. Rakovich's activities. Those statutes dealt with criminal defamation, criminal injury to business, and misconduct in public office.

At the conclusion of the charging conference, after hearing all of the available evidence, Mr. Crivello took the matter under advisement. Then, on December 7, 1981, he sent letters to all interested parties to inform them that, after reviewing the entire record, he did not believe that Mr. Rakovich had violated any Wisconsin statute. The entire investigation was, therefore, closed.

Based on this series of events, Mr. Rakovich filed this action under 42 U.S.C. § 1983. He alleged that Officers Wade and Drake and Chief Kass decided to investigate him to retaliate for his political opposition to the Greenfield administration.[2] He contended that the first amendment gives him a protected right to both investigate the Foley commendation and criticize

---

1. Mr. Rakovich was a member of the Greenfield Civil Service Commission at the time. However, he apparently was not acting in his official capacity while interviewing Mr. Sheehan.

2. In his briefs in this court, the appellee characterizes the appellants' retaliatory intent as being sparked by ill-will between the appellee and Chief Kass. First, trial testimony indicated that

the two had argued on at least one occasion. Second, as the appellee described this case, the appellants "viewed Rakovich as questioning the Chief of Police, in Kass's sensative [sic] public relations escapade, and ... [they] saw their duty as one of putting Rakovich in his place...." Appellee's Br. at 19.

the administration for conferring it. He claimed that, as a result of the appellants' activities, he was humiliated, embarrassed, and lost standing in the community.

The appellants conceded that they were investigating Mr. Rakovich. However, they denied having a retaliatory motive. Rather, they contended that the investigation was justified because Mr. Rakovich was possibly tampering with the chief witness to a felony burglary. In addition, the appellants contended that they had information indicating that confidential police information was being leaked to Mr. Sheehan via Mr. Rakovich. Based on these facts, the appellants argue that they had authority to investigate Mr. Rakovich.

At trial, the jury found that the appellants had conducted a retaliatory investigation which was designed, at least in part, to discourage Mr. Rakovich from exercising his first amendment rights. The jury awarded Mr. Rakovich $140,000 in compensatory and punitive damages.

In this appeal, three issues have been raised. First, the appellants contend that they have not violated Mr. Rakovich's first amendment rights. They argue that a first amendment claim cannot be raised when the plaintiff is unable to prove actual damages apart from the type of harm which is normally associated with defamation. Alternatively, the appellants claim that there was insufficient evidence to support a finding that they acted with a retaliatory motive. Second, the appellants contend that they should be exonerated because they were protected by both qualified and absolute immunities. Finally, the appellants contend that, even if they violated Mr. Rakovich's first amendment rights, the jury's damage award was excessive.

## II
## Liability

The appellants initially contend that Mr. Rakovich did not prove a violation of his first amendment rights. Relying on *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), and related cases, the appellants argue that Mr. Rakovich's damages amount to nothing more than injury to his reputation and, thus, are not actionable under section 1983. Rather, according to the appellants, Mr. Rakovich had to show that a more defined interest was abridged in order to state a claim.

Mr. Rakovich's claims should have been dismissed if he merely alleged an injury to his reputation. *See Mark v. Furay*, 769 F.2d 1266, 1271 (7th Cir.1985). Section 1983 can only redress injuries to constitutionally-protected rights; it is well-settled that the Constitution cannot be invoked to redress mere defamation. *Paul*, 424 U.S. at 712, 96 S.Ct. at 1165. However, in this case, Mr. Rakovich is not merely alleging that the Greenfield officers acted to defame him. Rather, he claims that Chief Kass, Detective Wade, and Sergeant Drake investigated him with the intention of retaliating against him for the exercise of first amendment rights. The alleged harm, then, is that Mr. Rakovich's first amendment rights have been violated, not that he has been defamed. *See Anderson v. Central Point School Dist. No. 6*, 746 F.2d 505, 507–08 (9th Cir.1984).[3]

As this circuit recognized under different circumstances in *Matzker v. Herr*, 748 F.2d 1142 (7th Cir.1984), "[a]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983...." *Id.* at 1150. Mr. Rakovich had a protected interest in commenting on the activities of local govern-

---

**3.** In *Anderson v. Central Point School Dist. No. 6*, 746 F.2d 505 (9th Cir.1984), the court stated that:

Defendants contend that because the plaintiff lost no salary as a result of the defendants' action, we should treat the case as one for defamation and hence not maintainable under section 1983 in light of *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Defendants' position, however, confuses the cause of action with the nature of the damages suffered. In *Carey v. Piphus*, 435 U.S. 247, 265, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978), the Court observed that damages in section 1983 cases must be tailored to the particular interest protected. Here, the protected interest is the appellant's first amendment rights, and his damages are the result of a violation of those rights.

746 F.2d at 507–08.

ment officials; he therefore stated a claim which, because it was supported by sufficient evidence, was properly put to the jury. Mr. Rakovich was not required, as a predicate to his first amendment action, to prove actual damages. As the Sixth Circuit stated in *Walje v. City of Winchester*, 773 F.2d 729, 732 (6th Cir.1985):

> As a basic element of our fundamental law, the First Amendment's protections of speech, press and assembly serve not only as an instrument of successful self government, but as symbols of the kind of society we wish to be. Because it serves more than merely instrumental goals, the right of free speech may be violated without accompanying consequential or "actual" injury.

Accordingly, by alleging government conduct taken in retaliation for the exercise of protected first amendment rights, Mr. Rakovich stated a claim which is actionable under section 1983. *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–84, 97 S.Ct. 568, 574–75, 50 L.Ed.2d 471 (1977) (cause of action where defendant refused to rehire plaintiff be-

cause he exercised rights protected under the first amendment); *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) (government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech"); *see also Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982).

■ Turning to the particular facts of this case, we conclude that the jury's finding of liability is supported by the record. The appellants admit that, at the very least, they investigated Mr. Rakovich. They argue, however, that Mr. Rakovich did not prove that they acted with an intent to retaliate against him for the exercise of his first amendment rights. We disagree. The jury was presented with sufficient evidence concerning the appellants' investigation of the Foley commendation to entitle them to infer a retaliatory motive.[4] *See Wilson v. Thompson*, 593 F.2d 1375, 1387 (5th Cir.1979). Therefore, we affirm the judgment of the district court insofar as it finds the appellants liable for violating Mr. Rakovich's first amendment rights.[5]

---

**4.** Charitably read, the jury instructions inartfully explained the process for resolving first amendment claims involving the possibility of mixed motives (legitimate law enforcement versus retaliation). *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). However, in the absence of any specific challenge to those instructions, we will not review them on appeal. *See Thor Power Tool Co. v. Weintraub*, 791 F.2d 579, 584 (7th Cir.1986); *Davis v. Consolidated Rail Corp.*, 788 F.2d 1260, 1267–68 (7th Cir. 1986); *Exxon Corp. v. Exxene Corp.*, 696 F.2d 544, 549 (7th Cir.1982); *see also Spanish Action Comm. of Chicago v. City of Chicago*, 766 F.2d 315, 318–19 (7th Cir.1985); *Parrett v. City of Connersville*, 737 F.2d 690, 698 (7th Cir.1984), *cert. dismissed*, 469 U.S. 1145, 105 S.Ct. 828, 83 L.Ed.2d 820 (1985); *Platis v. Stockwell*, 630 F.2d 1202, 1206–07 (7th Cir.1980).

**5.** Appellants also submit that, with respect to their activities in conjunction with the charging conference, they are entitled to the absolute immunity accorded to a prosecutor. *See generally Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). We disagree. Our review of the record convinces us that the defendants' activities did not involve the initiation or conduct of a criminal prosecution. Their activities were investiga-

tive, not prosecutorial, in nature. *See Harlow v. Fitzgerald*, 457 U.S. 800, 811 n. 16, 102 S.Ct. 2727, 2734 n. 16, 73 L.Ed.2d 396 (1982); *Butz*, 438 U.S. at 515–17, 98 S.Ct. at 2915–16; *Rex v. Teeples*, 753 F.2d 840, 843–44 (10th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 332, 88 L.Ed.2d 316 (1985).

Qualified immunity was not available to the defendants here. There can be no question that the right to criticize the government without becoming the object of retaliation by government officers is a "clearly established ... constitutional right of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738.

Because the issue of qualified immunity is properly addressed to the court, not the jury, *see Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985); *Benson v. Allphin*, 786 F.2d 268, 274 (7th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986), there was no need to give an instruction to the jury on the issue. Nevertheless, the trial judge, without objection, did give an instruction on qualified immunity. Appellants' lack of objection at trial precludes our review of the matter on appeal. *See supra* note 4. Putting aside for a moment the lack of objection, we do not believe that this instruction substantially prejudiced the defendants' rights. Indeed, the trial judge's statement of the law was a good deal

## III

### Damages

Although we leave undisturbed the jury's assessment of liability, we disagree with the amount of its compensatory and punitive damage awards. In this circuit, the standards for reviewing these types of awards are well-settled. With respect to compensatory damages, we may set aside the jury's verdict only when we find that it is grossly excessive or shocking to the judicial conscience. *Strauss v. Stratojac Corp.*, 810 F.2d 679, 686 (7th Cir.1987). With respect to punitive damages, we may set aside a jury award only when it "exceeds what [is] ... required to serve the objectives of deterrence and punishment." *McKinley v. Trattles*, 732 F.2d 1320, 1327 (7th Cir.1984). In this case, the jury's compensatory and punitive awards have transgressed both standards. Accordingly, we remand this case to the district court for a redetermination of damages.

### A. *Compensatory Damages*

■ The jury awarded Mr. Rakovich $50,000 for compensatory damages. That award is grossly excessive. In *Carey v. Piphus*, 435 U.S. 247, 259, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252 (1978), the Supreme Court noted that, as a general proposition, compensation for the deprivation of a constitutional right must be "tailored" to the particular interests and violations which are involved. We do not believe that the jury sufficiently respected this principle.

■ Therefore, on remand, Mr. Rakovich will be entitled to nominal damages to compensate for the technical violation of his first amendment rights. *See Davis v. Village Park II Realty Co.*, 578 F.2d 461, 463 (2d Cir.1978); *see also Memphis Community School Dist. v. Stachura*, — U.S. ——, 106 S.Ct. 2537, 2544 n. 11, 91 L.Ed.2d 249 (1986). Additional damages should not be awarded for the constitutional violation unless Mr. Rakovich can present the jury with substantiated proof of an actual first amendment injury. *Memphis Community*, 106 S.Ct. at 2544. Additionally, Mr. Rakovich will be able to recover for *demonstrable* emotional distress, physical and mental pain and suffering, and injury to his reputation. Those types of damages can flow directly from the constitutional violation and, when proven, are compensable. *See Crawford v. Garnier*, 719 F.2d 1317, 1324–25 (7th Cir.1983); *see also Memphis Community*, 106 S.Ct. at 2544.[6] Again, we stress that those damages must be proven and causation must be traced to the appellants' unconstitutional activities.[7]

---

more favorable to the position of the defendants than it should have been. The court told the jury that subjective good faith was a defense. Contrary to the instructions proffered by the parties and accepted by the district judge, qualified immunity is a doctrine under which "government officials performing discretionary functions [ ] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct at 2738.

**6.** In *Nekolny v. Painter*, 653 F.2d 1164 (7th Cir. 1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982), we noted that "[a] single statement by a party that he was 'depressed,' 'a little despondent,' or even 'completely humiliated,' ... is not enough to establish injury...." *Id.* at 1172–73. However, that is not to say that an injured person's testimony, standing alone, will never be sufficient to establish damages. *See Crawford v. Garnier*, 719 F.2d 1317, 1324 (7th Cir.1983). Rather, under *Nekolny*, when the injured party provides the sole evidence, he

must reasonably and sufficiently explain the circumstances of his injury and not resort to mere conclusory statements.

**7.** In instructions which were apparently not contested at trial—and certainly not contested in this court—the trial judge instructed the jury that liability could be premised on *one or more* of the following acts: 1) continuing an investigation while knowing that Mr. Rakovich had not committed a crime; 2) knowingly causing Mr. Rakovich to be summoned before the District Attorney for a charging conference; and 3) releasing information to the press about the charging conference. The jury was also instructed that Mr. Rakovich's theory of the case was that these acts were taken in retaliation for the exercise of his first amendment rights. The district court further instructed the jury that, if such acts were undertaken "to harass or stigmatize any citizen solely in retaliation for engaging in an activity protected by the United States Constitution," such acts would be unlawful. The jury returned a general verdict. It is not known, therefore, whether the jury believed that all or a lesser number of these activities were

## B. *Punitive Damages*

 Mr. Rakovich also was awarded punitive damages. Given the facts of this case, we believe that an award of this type was justifiable. In assessing liability, the jury obviously concluded that the appellants acted with a desire to retaliate against Mr. Rakovich. We believe that such a retaliatory motivation is, under the facts presented here, sufficient to support an award of punitive damages. Therefore, the jury was entitled to award punitive damages as necessary to deter future police conduct of this nature. *See Endicott v. Huddleston*, 644 F.2d 1208, 1217 (7th Cir.1980). However, we believe that the amount which the jury awarded, $90,000,[8] exceeded that which is necessary to effectuate deterrence.

Accordingly, we must remand this case for a new trial which is limited to a redetermination of both compensatory and punitive damages.[9] On remand, the district court is free to adjust—in its discretion— the award of attorneys' fees to reflect the extent of the appellee's success. *See Hamilton v. Daley*, 777 F.2d 1207, 1213 (7th Cir.1985); *Smiddy v. Varney*, 665 F.2d 261, 268 (9th Cir.1981), *cert. denied*, 459 U.S. 829, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982).

So Ordered.

COFFEY, Circuit Judge, dissenting in part.

I dissent from that part of the Majority opinion in this section 1983 action affirming the liability of the defendant police officers, Wade, Drake and Kass for violating Rakovich's constitutional rights. The Majority upholds the defendant police officers' liability concluding that the "jury was presented with sufficient evidence concerning the appellants' investigation of the Foley commendation to entitle them to infer a retaliatory motive," despite the fact that Rakovich presented absolutely no evidence establishing that the defendant officers undertook their investigation of possible witness tampering in retaliation for Rakovich's criticism of Greenfield officials. The district court failed to instruct the jury as to Rakovich's burden of establishing a retaliatory motive, and did not define retaliatory motive for the jury. Furthermore, the Majority has chosen to ignore the district court's error of instructing the jury concerning a good faith qualified immunity defense that was not available in this action based on retaliatory motive under section 1983. Added thereto, the Majority completely disregarded another error in the district court's instructions on a very critical pivotal question of law when it incorrectly instructed the jury that the assistant district attorney who participated in the witness tampering investigation was entitled to absolute immunity. Thus, under the Majority opinion, a police officer who participates in a properly authorized police investigation based on reasonable cause into possible tampering with the primary witness in a criminal proceeding or even possible information leaks within the police force, would be subject to liability if the subject or subjects of such inquiry can establish evidence of a long past disagreement (four years) and/or controversy with anyone involved in the inquiry. Because the Majority opinion if it stands will unnecessarily handcuff dedicated public officials interested in honest, efficient and clean

established. Since the appellants failed to object to such a generalized instruction, we must assume that they were willing to permit the case to go to the jury on Mr. Rakovich's theory that the events were part of a single scheme of retaliation for the exercise of first amendment rights. *See Thor Power Tool Co. v. Weintraub*, 791 F.2d 579, 584 (7th Cir.1986); *Davis v. Consolidated Rail Corp.*, 788 F.2d 1260, 1267–68 (7th Cir.1986); *Exxon Corp. v. Exxene Corp.*, 696 F.2d 544, 549 (7th Cir.1982); *see also Spanish Action Comm. of Chicago v. City of Chicago*, 766 F.2d 315, 318–19 (7th Cir.1985); *Parrett v. City of Connersville*, 737 F.2d 690, 698 (7th Cir.1984),

*cert. dismissed*, 469 U.S. 1145, 105 S.Ct. 828, 83 L.Ed.2d 820 (1985); *Platis v. Stockwell*, 630 F.2d 1202, 1206–07 (7th Cir.1980).

8. The jury assessed punitive damages of $40,000 against appellant Kass. Appellants Wade and Drake were each assessed $25,000 for punitive damages.

9. On remand, the defendants-appellants may wish to reexamine their interests and determine whether separate counsel would be appropriate for each defendant or particular defendant-groups which do not share the same interests.

government, including police officers charged with the duty of investigating alleged governmental misconduct, I dissent.

Rakovich inanely claims that the defendant police officers investigated his activities concerning his contacts with the chief witness in a criminal proceeding in retaliation for his criticisms of the Greenfield municipal government and its police department. Rakovich's allegation in my opinion, amounts to nothing more than political harassment and attempted intimidation of law enforcement officials, all of whom were properly performing the duties of their respective offices. *See Riedy v. Sperry*, 83 Wis.2d 158, 168, 256 N.W.2d 475 (1978). In support of his claim that the defendant officers investigated him in retaliation for his criticism of Greenfield officials, Rakovich produced nothing, but purely speculative evidence that some four years prior to the events which are the subject of this lawsuit he had a disagreement with the chief of police, resulting in his (Rakovich's) resigning from the City of Greenfield, Wisconsin Auxilliary Police Force. In addition, Rakovich produced evidence of other past criticisms of the mayor (1981) and other officials while he was a member of the Greenfield Civil Service Commission. The Majority apparently adopts Rakovich's personal self-serving characterization of the case:

> "Second, as the appellee described this case, the appellants 'viewed Rakovich as questioning the Chief of Police, in Kass' sensative [sic] public relations escapade, and ... [they] saw their duty as one of putting Rakovich in his place...."'

But, as I have pointed out, the record is barren of any evidence of the defendant officers' alleged retaliatory motive other than Rakovich's vague, ambiguous and speculative assertions concerning his prior disagreements with Greenfield officials, most of which if they occurred at all, occurred years prior to the investigation which is the subject of this lawsuit. On the other hand, the record does clearly establish the retaliatory motive of the plaintiff Rakovich in bringing this lawsuit against the defendant officers. In an interview of Rakovich conducted by Sergeant Scopoline

of the Milwaukee County Sheriff's Department as part of the Milwaukee County District Attorney's investigation of Rakovich's alleged involvement in the alleged witness tampering, Rakovich stated:

S. [Sargeant Scopoline] Can I ask you George, why would you offer to get someone an attorney and help him out with investigator fees if need be.... is there a reason for that?

G. [Rakovich] Yes there is, because of all crap that went on in Greenfield, Chief Kass charged me with the theft of a Police badge and to this day I wont [sic] forgive him or will ever let it go.... I'm on the Commission, I treat him like a gentleman, but this is still in the back of my mind, I didn't steal the badge, I got it from the City of Greenfield when I quit the department, Wade did not ask me for the badge as it so states in the paper. He didn't ask me.... nobody asked me for the badge, so you know what I did, I went to Howard Wall, and I said Howard, if they want this badge so goddam [sic] bad, here take it, but make sure it don't.... Shove it up his ass—now you tape that, thats the exact words I told Howard Wall & our mayor at the time.

S. Well, obviously, George, we're not familiar with....

....

G. Well, this.... you want to know what happened.... why I'm bitter.... why am I being accused now—they put their stamp on me.... let them try it....

\* \* \* \* \* \*

S. Okay, George, we had an off-the record discussion where you vented a little bit about why you felt this was going on at the Greenfield Police Department—it's been a thorn in your side for a while, is that correct?

G. That's correct.

\* \* \* \* \* \*

S. Based upon our conversation, we've had with you here today, is there anything you would like to add as to what

you think about this whole matter, or what your intentions may or may not be?

G. Well, I think this whole matter here right now, has come down this low that they have to go this low to investigate a man that helped apprehend burglars in the city and I hope to Christ that no citizen ever helps our department again, because I know I won't.

I'm sorry that I caused the trouble, but this is from now on, if I see anything, especially the Greenfield Police Department, if I see anything, you can go to hell, all of you. This cost me two hours this morning and for what?

S. Well

G. And I don't think I did wrong by informing the guy that what I heard was hearsay—that's all they ever go on is hearsay—of course they set this up—I knew I was being recorded, because I seen the guy open the door and close it—I said, if your taping me fine—it better be on the tape, because that's what I said—it better be on the tape—because when he opened the door, he snapped it.

S. It's your statement that you did or did not ever discredit any member of the Greenfield Police Department including the Chief.

G. I don't recall ever discrediting, no. If I made a statement of fact that I don't like the way they're operating— the way things are going in our department.

Interview with Rakovich, September 21, 1981 at Rakovich's business, D & E Auto Salvage. Thus, there is convincing evidence establishing that the plaintiff Rakovich, not the defendant officers, harbored almost a vicious intent to retaliate against the defendant officers.

The Majority upholds the jury's verdict against the defendant police officers on the basis of what can be classified at best, as purely speculative evidence. A jury verdict "cannot be lightly set aside so long as it has a reasonable basis on the record," *Leonard v. Argento*, 699 F.2d 874, 882 (7th Cir.1983) (citing *Zenith Radio Corp. v. Ha-*

*zeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)). When reviewing a section 1983 claim, this court has stated:

"To bring a successful section 1983 claim, the plaintiffs must prove that the defendants deprived them of a right secured by federal law or the Constitution while acting under color of state law. *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1339 n. 1 (7th Cir.1985); *Beard v. Mitchell*, 604 F.2d 485, 495 & n. 12 (7th Cir.1979). In addition, to hold the city liable, the plaintiffs must establish that the defendants acted pursuant to governmental policy, custom, or regulation. *Monell v. Department of Social Servs.*, 436 U.S. 658, 690–91 [98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611] (1978)."

*Bergren v. City of Milwaukee*, 811 F.2d 1139, 1142 (7th Cir.1987). As we explained in *Beard v. Mitchell*, 604 F.2d 485, 495 (7th Cir.1979) (emphasis added):

"Plaintiff misconstrues the nature of a 'constitutional tort.' The loss of constitutionally protected rights, whether life, liberty or property, does not automatically translate into a cause of action against a government actor. The loss must have occurred because of the official's *unconstitutional conduct.* Conduct is not unconstitutional merely because it may proximately cause harm to a citizen."

Thus, under the guise of a 1983 action and without any reasonable basis in the record, the Majority, in upholding the liability of the defendant police officers, establishes an unsound legal precedent for determining the liability of law enforcement officials while performing their sworn duties in a professional manner.

The Majority bases its decision to uphold the defendant officers' liability on the unbelievably tenuous connection between Rakovich's criticisms of Greenfield officials and the investigation into the suspicious circumstances concerning the repetitious (seven or eight times) questioning and harassment of a witness in a criminal proceeding; an investigation previously undertaken by the Greenfield Police Department and shortly thereafter joined in and coordi-

nated with the Milwaukee County District Attorney's Office with the aid of another agency, the Milwaukee County Sheriff's Department. The Majority, in sustaining the defendants' liability, has chosen to ignore the Supreme Court's decisions holding that the plaintiff in a section 1983 action must establish that his exercise of a constitutional right was a "substantial or motivating factor" in the alleged impropriety inflicted on him by the defendant. *See Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Here the evidence clearly establishes that the defendants would have conducted their witness tampering investigation "even in the absence of" Rakovich's public criticisms of Greenfield officials. In response to questions concerning the meritorious commendation citation to a Greenfield police officer,[1] the witness Sheehan told the police department that he had been interrogated and intimidated on numerous occasions about the burglary and the commendation. At this time, neither Sheehan nor the defendants had any idea that the plaintiff-respondent Rakovich was one of the persons allegedly tampering with the witness and interfering with the police department's internal investigation. Because of the defendant officers' lack of knowledge that Rakovich was involved in the witness tampering, whatever protected conduct (criticism of Greenfield officials) Rakovich might have engaged in could not possibly have been a "substantial or motivating factor" in the defendants' decision to investigate the police information leak or the possible witness tampering. It was impossible that Rakovich's criticism of Greenfield officials could have been *a* factor in the defendants' decision to investigate, as the defendant

officers had no knowledge of the identity of the persons they were investigating.

During the investigation of the commendation it was revealed that two men had on several occasions questioned and challenged the witness's observations and recollection of the events surrounding the burglary. When the defendant Greenfield officers were alerted to the questioning and challenging of the witness, they became concerned that the two men contacting the witness might interfere with the successful prosecution of the suspected burglars. The defendant officers consulted with their chief and, upon the chief's suggestion, with the district attorney's office, who in turn instructed them to continue the investigation and report their findings to the Milwaukee County District Attorney's Office. As the assistant district attorney explained at trial:

Q. Now is it—as you testified earlier your key concern with regard to Sheehan was that any time a number of people talked to a witness, that the witness starts to get a little worn out about talking about the subject, isn't that right?

A. Not only that, but depending on what people are saying to that witness. I had allegations people were saying that the officer who participated in the arrest was a bad officer, that bad things were going on and here I was dealing with an individual, specifically Mr. Sheehan, who had been the victim of a burglary and who had witnessed the burglars apprehended at gun point and a person who I fully expected would have to testify in a courtroom to that effect and I was being told that there were individuals here who were repeatedly going to see Mr. Sheehan, for what purpose to this day I don't know, telling him all of these extraneous things.

1. Greenfield police officer Mary Foley received a commendation from the Greenfield Police Department for her involvement in apprehending the burglars during the Cars Unlimited burglary. Subsequent to her commendation, there were suggestions made in the local newspaper that Officer Foley had done nothing during the

burglary to merit the commendation and that only reason she received it was because her father was a local judge. Thus, Chief Kass ordered an investigation into the circumstances concerning the commendation to set the record straight as to Officer Foley's role in apprehending the burglars.

I was getting concerned at some point Mr. Sheehan was going to say these people are all crazy, I don't want any part of this and I don't want to go to court and testify about the burglary and there must be something wrong that I am not aware of. I could see there was nothing wrong here myself, and it didn't seem to me that these repeated visits to Mr. Sheehan were doing the State of Wisconsin and its community any good at all."

Obviously because the police had no knowledge that Rakovich was involved, the investigation was neither commenced nor continued in retaliation for the exercise of First Amendment rights as Rakovich alleged. Wisconsin law imposes a duty on public officials to carry out the duties and obligations of their office and the failure of a public official to fulfill his duty gives rise to criminal liability:

"Any public officer or public employe who does any of the following is guilty of a class E felony:

(1) Intentionally fails or refuses to perform a known mandatory nondiscretionary, ministerial duty of his office or employment within the time or in the manner required by law;"

Wis.Stat. § 946.12. At the time the defendant officers were conducting their investigation, Wis.Stat. § 943.30(3) made it unlawful for anyone to influence or attempt to influence a witness:

"(3)(a) whoever violates sub(1) by attempting to influence any witness in any matter, cause, action or proceeding before any court, officer or body mentioned in s. 946.31(1), or any petit or grand juror, in the performance of his or her functions as such, or to deter any such witness from testifying, is guilty of a class D felony."

In 1979 the Wisconsin legislature, prior to the alleged improper action of the police officers, recognized the rights of crime witnesses and enacted chapter 950 of the Wisconsin Statutes to provide for their protection. The statement of legislative intent incorporated into chapter 950 stated:

"In recognition of the civic and moral duty of victims and witnesses of crime to fully and voluntarily cooperate with law enforcement and prosecutorial agencies, and in further recognition of the continuing importance of such citizen cooperation to state and local law enforcement efforts and the general effectiveness and well-being of the criminal justice system of this state, the legislature declares its intent, in this chapter, to ensure that all victims and witnesses of crime are treated with dignity, respect, courtesy and sensitivity; and that the rights extended in this chapter to victims and witnesses of crime are honored and protected by law enforcement agencies, prosecutors and judges in a manner no less vigorous than the protections afforded criminal defendants."

Wis.Stat. § 950.01. Thus, the defendant officers in investigating the suspicious circumstances concerning the intimidation and harassment of their primary crime witness were only fulfilling their obligation and sworn duty as law enforcement officers under Wisconsin law. *See e.g., State v. Lombardi*, 8 Wis.2d 421, 99 N.W.2d 829 (1959) (holding sheriff liable for, *inter alia,* failing to properly investigate possible battery). As the Wisconsin Supreme Court explained in *Browne v. State*, 24 Wis.2d 491, 507, 129 N.W.2d 175, 131 N.W.2d 169 (1964):

"Certainly the police may investigate claims of crime on evidence not sufficient to justify an arrest.... Although both the Fourth Amendment and sec. 11, art. I [of the Wisconsin Constitution] protect against police invasion of personal privacy, police officers should be permitted to conduct a reasonable investigation when their suspicion has been reasonably aroused."

Naturally, the suspicious circumstances surrounding the reports that a Greenfield policeman accompanied by an unidentified man had been talking with, harassing and intimidating the witness to a burglary on numerous occasions "reasonably aroused" the suspicion of the defendant police officers that unlawful conduct was occurring and posed a definite threat to impede or

interfere with the pending criminal proceeding. Although the district attorney subsequently determined after a thorough investigation of the facts and the law applicable thereto not to charge Rakovich with violating the statutes concerning interfering with witnesses, that fact certainly does not make the defendant officers' conduct unreasonable, *see Browne v. State, supra,* and therefore does not establish a proper foundation for a section 1983 action.[2] In the mind and considerate judgment of the assistant district attorney, there was enough evidence for him to summon the respective parties to a charging conference after which he (the assistant district attorney) took the matter under advisement for nearly two months before finally coming to a decision not to charge them.

Despite the fact that the investigation by the police department into circumstances concerning the burglary and the prospective witness tampering had a perfectly legitimate origin and continuation even though it did not result in the prosecution of either suspect, the Majority concludes that the defendant police officers' duly authorized investigation conducted with the advice and counsel of the assistant district attorney violated Rakovich's constitutional rights. Somehow, some way, Rakovich speculates that the investigation was undertaken against him in retaliation for his criticism of Greenfield public officials and thus violated his constitutional right to criticize government officials. I fail to understand the Majority's reasoning based upon the record before us that the defendants' conduct concerning the investigation was retaliatory either before or after the investigation had identified Rakovich as one of the men who had continuously (seven or eight times) contacted the witness. In order that the investigation might be perfectly fair and objective, the assistant district attorney and the defendants arranged for Sergeant Scopoline of the Milwaukee County Sheriff's Department to interview Rako-

vich independent and removed from the investigation conducted by the defendant Greenfield officers. The record makes clear that those involved in the investigation went out of their way to make sure the investigation was fair and impartial and thus I fail to understand how the Majority can conclude that the jury correctly found that the defendants acted with a retaliatory motive. The defendants merely pursued the investigation and presented their findings to their supervisor, the chief of police, and the assistant district attorney who ultimately determined on the basis of the defendant officers' report and the interview of Rakovich by Sergeant Scopoline of the Milwaukee County Sheriff's Department that there was sufficient cause to summon all parties including Rakovich and the other man in the possible witness harassment and tampering to his office for a charging conference. This was perfectly reasonable decision based upon the wealth of information, including unwarranted and vicious comments about certain members of the Greenfield Police Department, that had been accumulated and documented during the investigation and the standard procedure in many law enforcement and prosecutorial offices. *See, Browne,* 24 Wis.2d at 507, 129 N.W.2d 175, 131 N.W.2d 169. Is the Majority about to make law that will require law enforcement officers to stop their investigation after they become aware that the subject of their investigation had previously been critical of the police department and other city officials? If that is the law, then logical reasoning and deduction permits every criminal who has at some point been critical of the governmental agency or official investigating his or her activities and/or conduct to use the threat of a section 1983 action to effectively stop legitimate investigations.

Rakovich also alleged that the defendants unlawfully photographed him and recorded his conversations as part of their alleged retaliatory conduct. But this once

---

**2.** The assistant district attorney testified that a decision not to issue charges did not mean that no crimes had been committed. Rather, the decision not to prosecute is committed solely to his discretion and involves the weighing of many factors, including, but not limited to, an individual's past record if any, the seriousness of the alleged crime, and the propensity for the individual to commit crime.

again is a figment of Rakovich's imagination and a distortion of the fact surrounding the defendant officers' investigation. The defendants, as a matter of proper law enforcement investigatory procedure, did have the scene of the burglary (used car lot, office and premises) under surveillance in order that they might be able to identify the other unknown individual who reportedly was continually questioning, harassing and intimidating the district attorney's chief witness to the burglary. The testimony accurately portrayed that the defendant officers were merely seeking to identify the individual who was allegedly continually harassing the burglary witness to a degree that the witness Sheehan was fearful and afraid. As Sheehan explained:

"Q. Now you testified that you felt that George Rakovich's contact with you was harassment, isn't that right?

A. Um-hum.

Q. And you felt harassed, isn't that right?

A. That's correct.

Q. Now, did you ever tell George Rakovich that he was harassing you?

A. I told him I don't want to be harassed by anybody anymore."

Since the defendants were not yet (the investigation was barely one week old) aware that Rakovich was involved, their surveillance of the burglary scene (including the taking of pictures) and interviews with the witness were proper and cannot reasonably be interpreted as retaliation against Rakovich for his criticism of Greenfield public officials.

Rakovich also alleged that the defendants injured his reputation in the community by reporting to the press that Rakovich had been summoned to a charging conference. But the record makes clear that the information concerning the charging conference was released to the press only after the defendant police officers had received requests for such information from the news media and had received the approval of the assistant district attorney to make the information public as it was part of a continuing story (burglary and questionable commendation award) in the local papers.[3] Pursuant to a proper request from a media reporter for information concerning the investigation, the defendants asked the assistant district attorney if it was proper to relate the details of the charging conference to the news media. Once the assistant district attorney approved and directed the release of the information the defendants then made it available to the news media. It was only natural that such information was requested by the news media and provided by the defendants since the department had been providing other information to the public throughout the course of the investigation at the request of the media as is common practice. The Wisconsin Supreme Court stated in *State ex rel. Youmans v. Owen,* 28 Wis.2d 672, 683, 137 N.W.2d 470 (1965): "public policy favors the right of inspection

---

3. The Majority takes the liberty of reciting as fact that Chief Kass informed the press on September 21, 1981, that Rakovich was to be summoned to a charging conference despite the contradictory testimony concerning the information release. The Majority apparently bases this assertion on the testimony of one person, Nancy Allan, a reporter with the Greenfield Observer, that Kass told her of the charging conference on September 21, 1981. Allen did not remember Kass actually telling her about the charging conference but assumed that since the information appeared in her column on September 24, 1981, that Kass had told her about it the previous Monday, September 21.

"THE COURT: When were you told by the Chief Mr. Rakovich was going to be ordered to the District Attorney's Office?

THE WITNESS: It's so difficult for me without having my newspaper copies here. Every-

thing I do comes out on a Thursday and it all kind of goes in sequence. It would have to have been—well, if this was October 1st, it would have to have been during the month of October that I was told that. I just don't know the sequence.

\* \* \* \* \* \*

THE COURT: So now is your testimony that's the date the Chief told you?

THE WITNESS: It would have to be that date. That was some very important news in this case. I certainly wouldn't have held it for a week. I would have printed it right away. If I went on a Monday, it certainly would have appeared in Thursday's paper."

However, Kass' testimony makes clear that he was not responsible for releasing the information, but rather that Drake or Wade released the information pursuant to the assistant district attorney's approval.

of public records and documents, and, it is only in the exceptional case that inspection should be denied." *See also Newspapers, Inc. v. Breier*, 89 Wis.2d 417, 426, 279 N.W.2d 179 (1979) (quoting *Youmans*). *Youmans* involved the release of information collected during an internal police department investigation of possible misconduct on the part of several police officers. Further, the Wisconsin right to privacy act, Wis.Stat. § 895.50, does not provide a cause of action for the release of information that is a matter of public record. *See* Comment, *Public Access to Law Enforcement Records in Wisconsin*, 68 Marq.L. Rev. 705, 722–25 (1985). Although Wisconsin law does not provide an absolute right at all times to information obtained by law enforcement agencies during an investigative proceeding, *see Newspapers, Inc. v. Breier*, 89 Wis.2d 417, 279 N.W.2d 179 (1979), the decision of the assistant district attorney or other law enforcement officials to release such information would not violate Wisconsin's right to privacy act. Thus, the defendant officers, in releasing the information concerning the charging conference pursuant to the assistant district attorney's direction, did not violate Rakovich's statutory right to privacy. As the Wisconsin Supreme Court explained in *Newspapers, Inc.*:

> "Nor does it appear that any right of privacy is afforded by state law. Under the recently enacted right of privacy law, sec. 895.50, Stats., ch. 176, Laws of 1977, 'One whose privacy is unreasonably invaded is entitled to ... relief.' Publicity given to a matter of private life may constitute an invasion of the right of privacy. However, the right to relief depends on whether there is 'a legitimate public interest in the matter involved.' Sec. 895.50(2)(c). The statute is to be construed 'in accordance with the developing common law of privacy.' Sec. 895.-50(3). The basic common law approach is that, where a matter of legitimate public interest is concerned, no cause of action for invasion of privacy will lie. [*Williams v.*] *Meredith Corp.*, 472 S.W.2d 1, 4 (Mo.Ct. of Appl.1971).... Moreover, the Wisconsin right of privacy

statute, sec. 895.50(2)(c), specifically states, 'It is not an invasion of privacy to communicate any information available to the public as a matter of public record.' "

89 Wis.2d at 431–32, 279 N.W.2d 179. *See also* Op.Att.Gen., Feb. 17, 1984 (Good faith disclosure of records relating to complaints against health care professionals while the matters are merely under investigation will not expose the custodian to liability for damages.) Rakovich's alleging that the defendants released the information concerning the charging conference in retaliation for Rakovich's criticism of Greenfield officials is without support in the record. Indeed, the initial decision and the subsequent direction to release the information concerning the charging conference was made independently by the assistant district attorney—not by the defendant officers and thus I fail to understand how the Majority can conclude that the defendants' release of the information concerning the charging conference was done as part and parcel of the Greenfield police department's retaliation against Rakovich.

The assistant district attorney testified at trial that based on the reports of the defendants Wade and Drake, there was "absolutely sufficient" cause for him to call the charging conference:

> "Q. Does the information contained in that report [of Wade and Drake] before you provide a sufficient and legitimate legal basis for you to feel that those officers committed themselves to an investigation that was sufficient enough in its integrity to order Mr. Rakovich in [for the charging conference]?
>
> A. [D.A. Crivello] Yes, absolutely."

Assistant District Attorney Crivello went on to explain the reasons for his concern and the need to fully pursue the investigation of Rakovich:

> "A. He [the witness to the burglary] was being contacted repeatedly by Mr. Rakovich. I was never able to understand what Mr. Rakovich's purpose was in his repeated contacts with Mr. Sheehan. I was uncomfortable with

that situation because I did not feel that these repeated contacts were serving any useful purpose and may have a detramental [sic] effect on the felony prosecution I was trying to conduct in the burglary case.

\* \* \* \* \* \*

A. And I was receiving allegations that there were communications being had by Mr. Rakovich and Mr. Salbashian to Mr. Sheehan and I didn't know. That was one of the purposes of the charging conference, whether or not they were attempting to influence that witness.

One of the ways I define influence a witness is that repeated contact by a witness with people in a case tends to discourage that witness from continuing to come forward in the prosecution. That's one of the things I was concerned about here."

The assistant district attorney further explained that his ultimate decision not to charge Rakovich did not negate the justification for summoning Rakovich to the charging conference:

"Q. The fact that you didn't issue any charges out of this investigation, does that have any relevancy to whether or not these officers brought this matter to your attention at the beginning?

A. No.

Q. Why is that:

A. The two things have no relationship to each other. Officers investigate suspected criminal activity. In issuing charges I decide whether or not that activity or alleged activity can be proven. First of all whether or not it occurred and second whether or not it can be proven beyond a reasonable doubt. There's no logical relationship between those two things. I am operating on a much different level than investigating officers are.

\* \* \* \* \* \*

Q. Was there anything that came out of the October 16th meeting that would

cause you on due reflection to think that there was no reason or legitimate basis to call that meeting?

A. No."

Thus, the record is clear that it was the assistant district attorney who ordered the charging conference as a result of the combined investigation of the Greenfield Police Department and Milwaukee County Sheriff's Office into Rakovich's continued harassment and intimidation of the burglary witness because he was convinced that as the primary prosecutorial agency in Milwaukee County, it was his responsibility to interview all of the parties involved in the suspicious circumstances concerning the burglary witness. A charging conference was the only way the assistant district attorney could analyze and weigh the facts and suspicious circumstances surrounding the questioning and harassment of the burglary witness and reasonably determine whether to exercise his discretion to initiate the prosecutorial process against any or all of the individuals involved. The witness Sheehan testified that he had reported to officers Drake and Wade that he was both fearful and felt intimidated by the two individuals who were not only harassing him, but were also questioning and challenging his observations and recollection of the events that occurred during the apprehension of the burglars by the police.[4] The witness Sheehan told the officers that the two individuals were trying to get him to change his story concerning the events and the facts surrounding the burglary episode and which led to the officer's meritorious commendation. The witness stated in his deposition which was read into evidence at trial:

"Q. Did you at that time receive any comments from Mr. Rakovich concerning the City of Greenfield Police Department?

A. Yes, I did. In ways he was telling me that they were trying to cover up for Mary [the officer who received the commendation] and trying to get my story where it would be changed,

---

4. The witness Sheehan was unavailable to testify at trial, but his deposition was read into the record with extensive direct and cross-examination.

where she didn't do any part in this apprehending of the two guys [burglars]."

The witness went on to state in his deposition that he felt the man who was continually questioning and challenging him about his recollection of the burglary circumstances was in effect harassing him:

"Q. Now you testified that you felt that George Rakovich's contact with you was harassment, isn't that right?

A. Um-hum.

Q. And you felt harassed, isn't that right?

A. That's correct.

Q. Now, did you ever tell George Rakovich that he was harassing you?

A. I told him I don't want to be harassed by anybody anymore."

The witness also stated that one of the individuals, who was later identified as Rakovich, told him that the Greenfield police were checking up on him and that he (the witness) could sue the police department for checking up on him:

"A. He [Rakovich] came down here to tell me that, uh, that he found out from somebody in the Greenfield Police Department that they were checking me out and that, uh, he was hinting around to me, like telling me that there's laws on that, that I could sue the Greenfield Police Department for finding out information that they're not supposed to be nosing into, or whatever the way he put it."

Rakovich went so far as to encourage Sheehan to sue the City of Greenfield—offering to pay the initial legal investigation fees if Sheehan would so do:

"Q. Did Mr. Rakovich tell you that the Greenfield Police Department was violating the law in doing a records check on you?

A. [Sheehan] That's correct.

Q. And that you could sue the Greenfield Police Department for that?

A. That's correct.

Q. And did he ever suggest to you that he would pay any money towards that end?

A. He sure did.

Q. What? Tell the Court and jury, please, what happened with Mr. Rakovich in that connection.

A. Well, he said that he could pay a retainer fee of $50 and get ahold of a newspaper person to go down with me, get ahold of a lawyer to go down with me to the Greenfield Police Department to get my records that they were supposed to have been checking out on me, to find—because of some investgation on me, that they were—

Q. And—I'm sorry.

A. —they were trying to find out. So he said he'll pay the $50, to go do there.

Q. For the lawyer?

A. Right."

This is another example of Rakovich's unnecessary interference in the police department's investigation and the district attorney's prosecution of the burglary, all done with an eye toward causing problems for the Greenfield police department. Thus, with all of this information at his disposal, the assistant district attorney had every reason as well as an obligation to investigate the persons who were harassing and intimidating the chief witness to a burglary prosecution. Indeed, the assistant district attorney would have been negligent in his duties as a representative of the chief prosecutorial agency in Milwaukee County had he not vigorously pursued the investigation to its proper culmination in order that he might establish whether or not in the exercise of his discretion he should charge one or more of the individuals involved.

Thus, in the absence of any testimonial support in the record, I fail to understand how the Majority can find a "reasonable basis in the record" sufficient to allow the jury's liability verdict to stand. The assistant district attorney with eleven years' experience in the prosecutor's office and an independent, quasi-judicial official, determined on the basis of the information presented to him that a charging conference was necessary. The charging conference gave everyone involved—including Rakovich—an opportunity to explain their

conduct and present additional information to aid the assistant district attorney in deciding whether to prosecute the parties involved. Furthermore, the record unquestionably establishes that it was the assistant district attorney, *not* the defendant officers, who made the independent and well-reasoned decision based on all of the evidence before him that in order to fulfill his responsibilities it was necessary that he call a charging conference. Prior to calling the charging conference, the assistant district attorney neither knew Rakovich, nor did he have any contact with the Greenfield officials who were the subject of Rakovich's criticisms. As the assistant district attorney testified, calling a charging conference was the standard and usual practice of the Milwaukee County District Attorney's Office and it was his decision and his alone based upon all the files and information he had at his disposal, including but not limited to Rakovich's scurrilous remarks about the Greenfield Police Department and how and who they investigate, to order the parties in:

"Q. Now there's been some discussion in this case about the police requesting of you a charging conference. Assuming the police had requested in this case a *charging conference* for Mr. Rakovich, did you make any determination independent of that request as to whether he should be brought in for a so called *charging conference?*

\* \* \* \* \* \*

THE WITNESS: [District Attorney] As it relates to a situation like this, when we have an investigation like this going on, and there's a *question in the mind of the District Attorney* who is handling the case, specifically myself, as the *exactly is going on, whether or not crimes* are being committed, one of the ways we handle it is the order in, charging conference procedure. And what happens in that situation is *we cause the officers that are conducting the investigation to order all of the people involved to come in the District Attorney's Office for this charging conference.*

*We call all the conferences we have of this type charging conferences. Many of them result in people being charged with crimes.* That's where the name comes from. That's what happened in this case. We had a situation with these *allegations of Mr. Rakovich and Mr. Salbashian having all of these contacts with the witness Vincent Sheehan and based on the reports and those verbal discussions I had had with Sergeant Drake and Investigator Wade I decided to order everyone in for this conference.* Because I wanted them to explain to me what was going on.

Q. *Had you made up your mind to put that order in before they made a request* to you to do so?

A. Yes.

Q. When Officers Wade and Drake then or let's take Officer Drake made the *referral slip out* to have *it served upon Mr. Rakovich, was that made* pursuant to your direction?

A. That was *my direct order.*

Q. Were they at that time then acting, if you will, as *an agent for you in carrying out your orders?*

A. *Yes, I believe they were.*"

Emphasis added. Since the decision to call the charging conference was made singularly by the assistant district attorney (the defendants were without such authority) there is no evidence in the record to support Rakovich's claim that the charging conference was part of the alleged retaliatory conduct the defendants took against him. Moreover, Officers Wade and Drake in conducting their investigation into the alleged police information leak and witness tampering were acting pursuant to the directions of Chief Kass and would have risked disciplinary action or even possible dismissal from the police department for neglect of duty in failure to carry out a superior officer's command had they not vigorously pursued the investigation. Thus, Officers Wade and Drake were merely following the orders of their superior, Chief Kass, and were not acting as a result of any retaliatory motive against Rakovich. Indeed, there is nothing in the record that

suggests Officers Wade or Drake had any reason to harbor bad feelings or a retaliatory motive against Rakovich. The Majority, in affirming the jury's verdict of liability against Officers Wade and Drake is, in effect, holding Wade and Drake liable for performing their assigned duty—for properly following the orders given by their chief. *See Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1348–49 (7th Cir.1985). Moreover, if liability can be premised on the failure of the district attorney to prosecute a suspect, the police have added incentive to charge everyone they investigate, even if innocent, to ensure their own immunity. They will be inclined to over-charge, or perhaps to negotiate for no-suit agreements as the price of not filing criminal charges. *See Town of Newton v. Rumery,* — U.S. —, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987). Neither would serve the interests of (vocal) suspects as a group.

Furthermore, since the assistant district attorney participated in and guided and counseled the witness tampering investigation, and called the charging conference, I am convinced Rakovich cannot properly proceed with his claim without making the assistant district attorney a party to the action. The assistant district attorney's actions were inextricably intertwined in the events concerning the investigation and charging conference and thus it is impossible to determine the liability of the defendant officers separate and apart from the actions of the assistant district attorney. Although joinder of additional parties is frequently done by the motion of one who is a party to the suit, the district court, *sua sponte,* may require the joinder of an additional party when necessary. Federal Rule of Civil Procedure 21 provides:

"**Misjoinder and Non-Joinder of Parties**
Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately."

*See also* Wis.Stat. § 803.06. The defendant officers' liability is clearly intricately linked to the liability of the assistant district attorney since they were acting pursuant to his advice and counsel. Clearly it was primarily the responsibility of the respective attorneys who had been actively involved in the litigation for several years to ensure that all necessary parties were properly before the court when the case went to trial. But in their absence, the district court on its own should have recognized during the trial that the question of the defendant officers' liability was inextricably intertwined with the potential liability of the assistant district attorney and, in the interest of justice, he should have declared a mistrial and ordered a new trial and required that the assistant district attorney be made a party to the suit in order that the question of liability of all parties, if any, might be properly adjudicated. The district court's failure to join the assistant district attorney clearly prejudiced the defendant officers since they were acting with his advice and counsel and thus it is patently unjust to hold the defendant officers liable for following the advice and counsel of the assistant district attorney when the assistant district attorney has not been made a party to the action.

Furthermore, a review of the record establishes that the district court's jury instructions concerning Rakovich's § 1983 claim and the defense of good faith qualified immunity were incorrect and grossly inadequate. Although neither party complained of the instructions, I believe the incorrect and inadequate instructions substantially prejudiced the defendants and thus merits discussion in order that we might aid the district court and avoid errors of this nature, magnitude and scope on remand. The district court instructed the jury that a good faith qualified immunity was available to the defendants. However, the good faith defense was not available against Rakovich's retaliatory motive claims since if Rakovich established that the defendants had acted with a retaliatory motive, he would have concomitantly established their bad faith, and thus precluded the defendants from establishing the good

faith qualified immunity defense. Obviously the good faith immunity instruction could only have confused and misled the jury, since it suggested that the plaintiff could prove his claim even though he failed to fulfill *his* burden of establishing the bad faith—retaliatory motive—of the defendants.

Moreover, the district court's instructions also failed to relate the specific elements of a retaliatory motive claim to the facts of Rakovich's case. Instead, the district court merely gave a generalized § 1983 instruction that failed to even mention retaliatory motive and thus failed to emphasize the plaintiff's burden of establishing that the defendant officers' investigation was retaliatory. More importantly, the generalized instruction did not explain that in order to recover, Rakovich had to establish a causal relationship between his prior criticism of Greenfield officials, and the defendant officers' investigation. The inadequate § 1983 instruction is even more significant and prejudicial in view of the district court's failure to even define for the jury the elements of retaliatory motive. The jury was left without sufficient guidance as to the plaintiff's burden of proof and thus it is very likely that the jury returned a verdict that was based on an erroneous perception of the rights and responsibilities of the parties.

Furthermore, the district court also failed to instruct the jury that the assistant district attorney's decision not to issue charges did not make the defendants' investigation improper. Thus, the jury was led to believe that since the assistant district attorney chose not to issue charges against Rakovich, the defendants' investigation was improper and unwarranted, and therefore the jury may have imposed liability even though Rakovich failed to demonstrate a causal relationship between his prior criticism of Greenfield officials and the defendant officers' investigation.

Finally, the district court also improperly instructed the jury that the assistant district attorney was entitled to absolute immunity for his participation in the investigation. This was clearly erroneous since the decisions of this court make clear that absolute immunity does not apply to a district attorney's investigatory functions. *See, e.g., Hampton v. City of Chicago,* 484 F.2d 602, 608 (7th Cir.1973). Since the assistant district attorney's participation in the Rakovich case prior to the charging conference was clearly investigatory in nature it was improper for the district court to instruct the jury that the assistant district attorney was entitled to absolute immunity concerning his participation in the investigation of Rakovich. In failing to properly instruct the jury as to the potential liability of the assistant district attorney and not joining the assistant district attorney as a proper party, the district court allowed the jury to make scapegoats of the defendant officers for any impropriety the jury may have assigned to the district attorney's conduct. This was clearly prejudicial to the defendant officers and would justify this court in reversing the jury's verdict.

The erroneous instruction concerning the defendant officers' liability is even more serious in view of the general verdict form the district court used. As the Majority admits, the use of the general verdict means that "[i]t is not known, therefore, whether the jury believed that all or a lesser number of these activities [release of information to press, investigating Rakovich, summoning Rakovich to a charging conference] were established." Thus, this reviewing appellate court has no way of assessing whether the jury correctly applied the law to the facts of his case particularly in view of the inaccurate and confusing nature as well as the overall lack of organization (lapse in time between mention of retaliation and elements of section 1983 claim) of the instructions, as the jury was not required to report the answers it gave to the several questions propounded in order to answer the general liability question put to it. We are left to speculate, just as the jury was left to speculate about Rakovich's claim, as to what the jury concluded. However, the Majority in an attempt to explain compounds the speculation:

"At trial, the jury found that the appellants had conducted a retaliatory investigation which was designed, at least in part, to discourage Mr. Rakovich from exercising his first amendment rights."

Not only does the Majority attempt to explain the basis of the jury's verdict after conceding they do not understand the basis, but its explanation contradicts Rakovich's complaint and pleadings: Rakovich emphatically stated in his complaint that the investigation was *retaliatory*, not that the investigation was intended to discourage him from exercising his first amendment right in the future. The "inartful" instructions on the defendant officers' liability when combined with the prejudicial effect of the district court's improper instruction on qualified immunity via retaliatory motives and incorrect instruction concerning the assistant district attorney's investigatory absolute immunity could only serve to confuse and mislead the jury and in fact did lead to a miscarriage of justice. The jury may very well have concluded that the assistant district attorney acted wrongfully, but since they were improperly instructed that Rakovich could not recover against the district attorney under any circumstances, they may very well have made the defendant officers scapegoats, since they were the only ones left in the case. This confusion clearly prejudiced the defendants' rights and thus I fail to understand how the Majority can accept the jury's verdict based as it is on three flagrantly improper instructions concerning the question of liability. But for some reason, the Majority agrees with the jury that the defendant officers acted in retaliation because (1) Rakovich and the chief of police (Kass) had argued on a previous occasion (four years before), and (2) Rakovich had been openly critical of Greenfield public officials in the past. The Majority overlooks the fact that the alleged argument between the defendant Police Chief Kass and Rakovich occurred some four years prior to the investigation that Rakovich and the Majority contend was undertaken in retaliation against Rakovich. The Majority has not been able to point to any evidence in the record that any hostility

between Rakovich and Kass—if it ever existed—continued after the 1977 episode. Indeed, Sergeant Scopoline's interview with Rakovich makes clear that if any hostility or retaliatory motive existed, it was Rakovich and not the defendant officers who harbored such ill-will (*see* Scopoline Interview, *supra* at 1401). Thus, without more, the tenuous link between the investigation and Rakovich's disagreement with Kass is clearly too speculative and too weak a thread to base liability on. The only other evidence the Majority identifies to support its conclusion that the defendants undertook the investigation in retaliation against Rakovich is the evidence that Rakovich had publicly criticized Greenfield officials—including members of the police department—in the distant past. But contrary to the Majority's conclusion, the evidence does not establish that Rakovich's criticism affected his relationship with those same officials; indeed Rakovich was reappointed to the Civil Service Commission by one of these very officials, the mayor of Greenfield in 1981, the time of this incident—the very man he had worked against in the previous mayoral election. Thus, the Majority in affirming the defendant officers' liability unjustifiably infers that the defendants, serving as public officials, actually "waited in the weeds," as it were, for an opportunity to take out their revenge against one who had criticized them. The Majority is guilty of committing the very same error that other courts have warned of: allowing plaintiffs to proceed on claims that are supported by vague, conclusory allegations of unconstitutional motive. *See, e.g., Hobson v. Wilson,* 737 F.2d 1, 29 (D.C.Cir.1984) ("in cases involving claim that defendants acted with unconstitutional motive, we will require that nonconclusory allegations of evidence of such intent must be present ... for litigants to proceed to discovery on the claim"); *Ostrer v. Aronwald,* 567 F.2d 551 (2d Cir.1977) ("Diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct"). The consequence of such an error is to allow plaintiffs who file meritless claims to enmesh public officials in the burdens of protracted litigation—including

time-consuming and expensive discovery, in hopes that somehow, sometime they will get the ear of a sympathetic jury. It is no wonder intelligent, highly-qualified people today are forsaking the holding of public office to the detriment of the American citizenry if they are to be thrown into the turbulent waters of ridiculous litigation of this nature. In this case, the evidence Rakovich presented at trial added little or nothing to the vague, speculative, unsupported and conclusory allegations he made concerning the alleged retaliatory motive of the defendants. The Majority's holding in effect will allow any individual to stop or prevent the initiation of a criminal investigation by alleging that he has criticized public officials in the past and by threatening to institute a section 1983 claim.

The Majority also overlooks the fact that Rakovich was only one of the persons investigated by the defendants and the district attorney. The investigation proceeded against *two* individuals who were reported to have contacted the burglary witness and who were treated similarly. Both individuals were simultaneously investigated in a similar fashion and directed to appear at a charging conference by the district attorney and neither was singled out for special disparaging treatment—even though the other individual involved was a Greenfield police officer. In view of the complete absence of any proof establishing a retaliatory motive and the absence of showing of any disparate treatment of Rakovich by anyone of those conducting the investigation, I am convinced that the jury could only have speculated that Rakovich was investigated because of previous criticisms he had made of Greenfield officials.

Thus, without one scintilla of evidence on which to base its decision, the Majority affirms the defendant police officers' liability and establishes a very dangerous precedent that can only impede the ability of all law enforcement agencies—from local police departments to the United States Marshals to the FBI—to carry out the duties and obligations of their office. Rakovich above all was not operating under any authority when he questioned and intimidated the burglary witness on seven or eight separate occasions. Rakovich was doing nothing but acting as a "busybody," political gossip, and agitator (suggesting that the witness sue the police and spreading spurious allegations and rumors) who had no right to interfere and make the police department's business his concern as he did in the official police department investigation. Thus, the Majority, in allowing Rakovich to recover damages from the defendant officers, places Rakovich "in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing [not criticized Greenfield officials]" since Rakovich would have no complaint had he never criticized Greenfield officials. *Mt. Healthy*, 429 U.S. at 286, 97 S.Ct. at 575. This is clearly contrary to the mandate of the United States Supreme Court in *Mt. Healthy* since it allows Rakovich to recover even though he failed to prove that his prior criticism of Greenfield officials was a substantial motivating factor in the defendant's decision to investigate the possible witness tampering and that the defendant officers would not have conducted the investigation "in the absence of" his protected conduct. Under the Majority's holding, in the future law enforcement and public officials will be well-advised to cease and desist from and avoid initiating or participating in any inquiry, investigation, or other process involving an individual regardless of how corrupt he or she might be if he or she had at one time or another been critical of the same public officials or had occasion to disagree with the same public official for fear that the First Amendment will be used to impose liability on them. Obviously, this will effectively impede and preclude public officials from proceeding against many people guilty of criminal activity in this country, a country which takes pride in its first amendment allowing its citizens to speak out on all issues without fear of reprise, and encourages citizens to do so. As the trial judge himself acknowledged six years ago in *Harris v. County of Racine*, 512 F.Supp. 1273, 1282 (E.D.Wis. 1981):

"While the statutory protection of individual civil rights has had the beneficial effects of legislatively reinforcing the importance of individual rights and creating remedies unknown at common law for violations of those rights, it has also had unforeseen consequences which must be taken into account in any discussion of public policy in connection with civil rights actions. One of the most significant and troublesome of those consequences is the chilling effect which the threat of such actions may have on public officials who, through fear of the consequences, may choose not to act rather than to act in a manner potentially controversial.

It has been my observation that many of the public officials who are sued under the civil rights laws are persons who have performed their 'duty' as they have seen it, but long after doing so and much to their surprise have subsequently been found by a court or a jury to have committed a violation of civil rights for which they are liable in punitive damages."

I cannot believe that the framers of our constitution ever intended the First Amendment right of free speech might be used by an imaginative lawyer to impede the effective and legitimate exercise of governmental authority through proper investigation.

This court should dismiss the case or at least reverse the jury's verdict and remand the case for a new trial on liability because: (1) the district court failed to properly instruct the jury on retaliatory motive and the plaintiff's burden of establishing that the defendant officers conducted their own investigation of the commendation and witness tampering *because* of Rakovich's previous criticisms of Greenfield officials; (2) the district court improperly instructed the jury that the defendants could immunize themselves from liability by establishing a good faith qualified immunity defense; (3) the district court incorrectly instructed the jury that the assistant district attorney was "totally immune from prosecution;" (4) the district court failed to define the term retaliatory motive for the jury; (5) Rakovich failed to present evidence to establish that his criticism of Greenfield officials was a substantial or motivating factor in the defendants' investigation of him. Since these errors misled the jury as to the liability of the defendant officers, the only reasonable disposition of this appeal is to dismiss Rakovich's claim or at least order a new trial as to liability with all proper parties joined. Although any one of these errors alone would be sufficient to affect the jury's verdict, the combination of these errors prejudiced the defendants to such a critical degree so as to require this court to dismiss Rakovich's claim or at the very least remand the case for a new trial. Further, the absolute lack of proof of any retaliatory motive on the defendants' part requires this court to dismiss Rakovich's claim as a review of the evidence reveals that no reasonable basis exists for the jury's verdict. I am convinced that the proper disposition of this case is dismissal, but should the Majority not be so inclined because a jury verdict is involved—even though the verdict is based on erroneous instructions, the case should be remanded on the question of liability and damages and it is in the best interests of Wade and Drake, in view of the fact that their interests may conflict with those of Kass, to consider separate counsel to present their defense independently of Kass. Because the Majority ignores these five critical errors, I am forced to dissent.